## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                              )
**LABED AHMED**,                              )
                                              )
        *Petitioner*,                         )
                                              )
        *v.*                                  )        CIVIL NO. 05-1234 (EGS)
                                              )
**GEORGE W. BUSH**, *et al.*,                 )
                                              )
        *Respondents.*                        )
_____)


**PETITIONER'S OPPOSITION TO RESPONDENTS' MOTION TO EXAMINE
PRIVILEGED COMMUNICATIONS SEIZED WITHOUT NOTICE OR APPROVAL
AND MOTION FOR ORDER TO SHOW CAUSE
WHY RESPONDENTS SHOULD NOT BE HELD IN CONTEMPT**

**INTRODUCTION**

The government's seizure and review of privileged attorney-client communications, without prior notice to and approval by the Court, and without notice to counsel, was illegal. As a matter of fundamental principle, and by specific order of this Court, those communications were supposed to be secure against seizure and review by the government. The government's failure to disclose its actions to the Court and counsel until nearly a month after the fact is deplorable, to say the least. In the name of investigating three prisoner deaths, the government has destroyed a fundamental privilege and shattered any confidence the prisoners might still have had that their communications with their counsel would be safe from the government's prying eyes. The government's motion should, therefore, be denied.

The stakes are too high for the Court simply to accept the factual assertions that form the basis of the instant motion. The government claims that the privileged communications were seized and examined in the course of an investigation into the suicide deaths of three prisoners; but, without independent verification, the Court cannot be certain that the deaths *were* suicides. The government claims that the initially seized and reviewed privileged communications supported the wholesale seizure and review of all privileged communications; but, without examining the communications, the Court cannot be certain *what* any of the seized materials contained.

The government's proffered justifications for seizing and reviewing privileged communications may be valid. At present, there is no basis for alleging, and we emphatically do not allege, that the prisoner deaths were not suicides, or that the government is concealing wrongdoing. The government's proffered justifications, however, may be nothing more than a pretext for collecting "prisoner intelligence" and wrecking the attorney-client relationship. Experience teaches that suicide

1

is not the only possible explanation for the death of a prisoner held in U.S. military custody. Experience also teaches that the military is not invariably forthcoming. The point is that the Court has only the government's account of what has happened. In view of the privilege at issue, the Court cannot afford simply to take the government at its word.

The Court should order the government to show cause why it should not be sanctioned for seizing and reviewing the prisoners' legal papers without prior approval of the Court and notice to counsel, and for failing to report its actions to the Court and counsel until nearly a month after the fact. The Court should also investigate how the Department of Justice allowed this massive breach of the attorney-client privilege to occur and should prescribe procedures to prevent breaches of the privilege in the future. Finally, the Court should order the government to return the prisoners' legal papers to counsel and destroy any copies. If the Court decides to allow any further review, the government should not be allowed to use such review as a fishing expedition. Any such review should be conducted in the first instance by the Court or a special master without the involvement of the military or the Department of Justice.

## ARGUMENT

### I.    THE GOVERNMENT SHOULD BE SANCTIONED FOR SEIZING THE PRISONERS' LEGAL PAPERS WITHOUT NOTICE AND APPROVAL.

On June 10, 2006, the military reported that three prisoners at Guantánamo Bay had been found dead in their cells with wads of cloth stuck in their mouths.[1]    The military reported the

---

[1] Colonel Mike Bumgarner, the commander of the prison, stated in an interview that each of the prisoners was found with "a large wad of cloth in his mouth"; Colonel Bumgarner stated that he "did not know if the material was for choking or to muffle their voices while they took their lives." Michael Gordon, *Officer Expects More Suicide Tries*, Charlotte Observer, June 12, 2006, *available at* http://www.charlotte.com/mld/charlotte/news/14797522.htm.

prisoners' deaths as suicides.[2]  In his news conference, Navy Rear Adm. Harry B. Harris, the commander of Joint Task Force–Guantánamo, denounced the deaths as act of war:  "I believe this was not an act of desperation, but an act of asymmetric warfare aimed at us here at Guantánamo," he said. "We have men here who are committed jihadists.  They are dangerous men and they will do anything they can to advance their cause."[3]  Colleen Graffy, Deputy Assistant Secretary of State for Public Diplomacy, called the deaths "a good PR move."[4]  According to the declarations of Admiral Harris and Special Agent Carol Kisthardt, the Naval Criminal Investigative Service (NCIS) initiated an investigation to determine "the manner and cause of death" of the three prisoners.[5]  Autopsies were to be performed, but results have not been made public.

Now, nearly a *month* later, the government has disclosed that, between June 10 and June 14, as part of the purported "investigation," NCIS seized and examined over a half-ton of written communications between Guantánamo prisoners and their lawyers.[6]  The government claims that it seized the prisoners' legal papers because notes found in the cells of the dead prisoners suggested that the prisoners might have used the cloak of the attorney-client privilege in furtherance of a suicide

---

[2]  U.S. Southern Command News Release, Three Detainee Deaths at Guantanamo Bay, June 10, 2006, *available at* http://www.southcom.mil/pa/Media/Releases/USSOUTHCOM%20 PRESREL%20Detainee%20Death%20FINAL%20%20(1415%2010%20Jun%2006).doc; Sara Wood, Three Guantanamo Bay Detainees Die of Apparent Suicide, June 10, 2006, *available at* http://www.defenselink.mil/news/Jun2006/20060610_5379.html.

[3]  Id.

[4]  Peter Graff, *U.S. Rows Back From Guantanamo Suicide Comments*, June 12, 2006 (Reuters), *available at* http://www.cageprisoners.com/articles.php?id=14438.

[5]  Harris Decl. ¶ 2; Kisthardt Decl. ¶ 2.

[6]  Kisthardt Decl. ¶¶ 2-5.

"plot" by the prisoners, perhaps "encouraged, ordered, or assisted by third parties."[7]  There is no way to know whether the notes suggested such use of privileged communications or, if they did, whether that was the actual reason for the government's subsequent actions.

The government seized and examined these privileged communications over a five-day period without court approval or supervision, without prior notice to the prisoners' counsel, and then waited nearly a month before disclosing its actions to the Court and counsel.  The government's seizure and examination of these materials violated not only this Court's orders directing the government to respect the attorney-client privilege but also the Protective Order entered by this Court to ensure the protection of that privilege.

Having belatedly disclosed its illegal seizure and examination, the government now asks the Court to condone its actions and permit it to retain the seized materials and examine them even more closely.  The fact that Petitioners' legal papers were seized over a five-day period demonstrates that no exigent circumstances required the government to act without first seeking the approval of the Court and notifying counsel.  At the very least, a conference call with counsel and the Court on June 10, the day of the prisoner deaths, could have been arranged.  The Department of Justice either approved the military's seizure of privileged legal materials without notice or court approval, or failed to have in place procedures to prevent what happened from occurring.  The Department's failure to disclose the government's actions until the *Abdullah* motion forced its hand suggests that the Department was a full partner in the military's breach of the privilege.  The Court should sanction the government for its unilateral, illegal, and devious conduct.

---

[7]  Harris Decl. ¶ 4.

4

## II.     THE PREMISE OF THE GOVERNMENT'S INVESTIGATION IS INVALID, AND ITS MOTION IS PREMATURE AT BEST.

The Court should not allow the government to examine the seized materials on the premise that the three prisoners' deaths, if suicides, were acts of "warfare" or "a good PR move," or that prisoners may be "plotting" to take their own lives.  The situation that the prisoners confront – over four years in prison on an isolated island, charged with no offense, refused knowledge of the evidence on which they are imprisoned, subject to contemptuous treatment by their keepers, and no end of their imprisonment in sight – would be sufficient to account for any suicidal acts.

The government's claims of suicide "plots" among the prisoners, possibly implicating "third parties," are merely a pretext for seizing and examining privileged communications.  If prisoners take their own lives at Guantanamo, it is because of the hopelessness of their situation and, at least in some instances, the effect of the government's interrogation techniques on their mental health.  Breaking the prisoners' spirits and psyches for the purpose of collecting intelligence is Guantanamo's *raison d'etre*.

Indeed, prisoners have been subjected to a variety of cruel, inhuman, and degrading treatment, including prolonged exposure to extreme heat and cold, religious humiliations (including abuse of the Koran and interference with prayers), threats of execution, threats against family, and prolonged solitary confinement.  Predictably, these tactics have caused the mental health of many Guantánamo prisoners to deteriorate.  According to government data, prisoners committed 350 acts of "self-harm" in 2003, of which 120 were attempted hangings.[8]  In August 2003, 23 men attempted to hang

---

[8]  Mark Denbeaux, The Guantanamo Detainees During Detention 6 (2006).

5

themselves.[9]  The government chose to describe all but two of these hangings as incidents of "manipulative self-injurious behavior," rather than as suicide attempts.[10]  In 2004, also according to government data, prisoners committed another 110 acts of "manipulative self-injurious behavior," though it did not report how many of these 110 incidents were attempted hangings.[11]  Even with its penchant for defining away suicides as "manipulative self-injurious behavior," the government has acknowledged that 29 prisoners have attempted suicide a total of 41 times.

On May 18, 2006, four more prisoners reportedly attempted suicide by overdosing on medicines they had hoarded, but in a statement released the following day, Commander Harris stated that only two of these efforts were counted as "suicide attempts," apparently because only two prisoners lost consciousness due to their attempts.[12]  Two others complained of dizziness and nausea, one claiming that he had attempted suicide but did not have enough pills.  These latter two received a medical and psychiatric evaluation, but Commander Harris called these prisoners "attention-seeking sympathizers who were not trying to actually commit suicide."[13]

Less than a month later, on June 10, 2006, the three deaths that led to the instant motion occurred.  In light of the history, purpose, and nature of Guantánamo, it is impossible to support the government's reflexive assertion that the deaths – if indeed they were suicides – were acts of belligerence rather than of despair.  At the very least, the government must demonstrate to the Court

---

[9]  Id.

[10]  Id. at 14.

[11]  Id. at 6.

[12]  Id. at 15-16.

[13]  Id. at 16.

a factual basis to support its assertion that these deaths *were* suicides before it engages in the wholesale seizure of privileged papers as part of an investigation of a suicide "plot."

## III.    THE GOVERNMENT'S SEIZURE AND EXAMINATION OF PETITIONERS' LEGAL PAPERS WAS UNLAWFUL.

This Court has ruled that prisoners held at Guantánamo have a right to representation by and access to counsel.  The Court has recognized that the attorney-client privilege attaches to communications between the prisoners and their lawyers, and it has gone to great lengths to protect that privilege by creating access procedures protecting the confidentiality of attorney-client communications.  The Court should not ratify the government's violations of the Court's orders by permitting it to review further the privileged communications that it has seized.

### A.    The Prisoners' Legal Papers May Not Be Seized and Reviewed Without An Individualized Showing of Probable Cause.

The attorney-client privilege is "the oldest of the privileges for confidential communications known to the common law."[14]  Its purpose is to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice."[15]  As this Court has recognized in the context of the Guantánamo litigation, "[t]he privilege that attaches to communications between counsel and client has long held an exceptional place in the legal system of the United States."[16]

Seizure of legal papers is particularly egregious because it strikes at the heart of the attorney-client relationship and interferes with the inmate's access to the courts.  "The taking of legal papers

---

[14]  Upjohn v. United States, 449 U.S. 383, 389 (1981).

[15]  Swidler & Berlin v. United States, 524 U.S. 399, 403 (1998).

[16]  Al Odah v. United States, 346 F. Supp. 2d 1, 10 (D.D.C. 2004).

will often (though perhaps not always) interfere with an inmate's right of access to the courts. . . .
[T]he destruction or withholding of inmates' legal papers burdens a constitutional right, and can only
be justified if it is reasonably related to a legitimate penological interest."[17]

The government's vague allegations of notes found in a dead prisoners' cell written by another
prisoner cannot qualify as a "legitimate penological interest" in seizing *all* legal documents from *all*
prisoners. Seizing legal papers interferes with a prisoner's access to courts and chills the giving,
receiving, and continued possession of communications from attorney to client, particularly when
seized without notice to the prisoners' attorneys or the court.

This Court has recognized that the prisoners – who have not been tried and who seek the
opportunity through their counsel to challenge the basis of their detention – have a right to counsel
and are entitled to a confidential relationship with their counsel. Over the government's objections,
"[t]he Court [found] that Petitioners are entitled to be represented by counsel."[18] Thus, "the Court
determine[d] that the government is not entitled to unilaterally impose procedures that abrogate the
attorney-client relationship and its concomitant attorney-client privilege covering communications
between them."[19] Yet the government has decided, in the teeth of this decision, "to unilaterally
impose procedures that abrogate the attorney-client relationship and its concomitant attorney-client
privilege covering communication between them."[20]

The government's actions violated the Protective Order and accompanying Access Procedures

---

[17] Goff v. Nix, 113 F.3d 887, 892 (8th Cir. 1997) (internal citations omitted).

[18] Al Odah, 346 F. Supp. 2d at 5.

[19] Id.

[20] Id.

in this case. To give meaning to the attorney-client privilege in this context, the Court implemented Access Procedures which created avenues of confidential communication between prisoners and their attorneys by laying the ground rules for in-person meetings, and for written communication between these parties. Indeed, the government admits that the seized materials "will likely include some number of attorney-client communications potentially subject to attorney-client privilege."[21]

But the government's unilateral abrogation of the privilege would have been unlawful even if it had not directly violated a Court order. Abrogation of the attorney-client privilege in any context requires the government to make a specific, *individualized* showing that there is sufficiently compelling justification for invading the privilege. For example, where the government invokes the crime-fraud exception to the attorney-client privilege, it bears the burden of making an adequate showing that the exception applies – i.e., that *that* client "made or received the otherwise privileged communication with the intent to further an unlawful or fraudulent act," and actually carried out that act.[22] Similarly, when the government seizes materials from a location that likely contains privileged papers, that seizure must be supported by probable cause and a warrant, and it still must employ appropriate means of screening out privileged materials.[23]

The government has not cited any cases that suggest the privilege may be invaded without an *individualized*, sufficiently rigorous showing that materials of a particular client or particular attorney

---

[21] Resps.' Mot. at 9.

[22] In re Sealed Case, 107 F.3d 46, 49 (D.C. Cir. 1997).

[23] See, e.g., United States v. Stewart, 2002 WL 1300059 (S.D.N.Y. June 11, 2002).

are likely to have been abused in furtherance of a crime.[24]  Even when such documents will be reviewed *in camera* by the court – and not by the government – "the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies."[25]

**B.    The Government Has Made No Such Individualized Showing.**

The government has presented no specific evidence that any of Petitioners, including Mr. Ahmed, have misused their attorney-client materials.  Indeed, the government does not even purport to do so.  Four or five documents seized from just a few prisoners cannot justify seizing over half-a-ton of privileged materials from hundreds of prisoners.  These documents, moreover, offer little support for the government's position that attorney-client materials are being misused – let alone specific evidence that any of Petitioners have misused such materials.  The documents cited by the government were found either in the possession of one of the deceased or were written by one of the deceased.  And the additional documents are telling in what they reveal – not a single inappropriate document was found in an attorney-client envelope.

First, the document labeled "FOUO" is a red herring.  "FOUO" or "For Official Use Only" stamps are *not* classification designations.  "FOUO" is nothing but an internal Department of Defense designation whose purpose is to determine whether a particular document may be released to the public under the Freedom of Information Act.  "The abbreviation 'FOUO' is used to designate *unclassified* portions that contain information that may be exempt from mandatory release to the

---

[24] See, e.g., United States v. Skeddle, 989 F. Supp. 890, 894 (N.D. Ohio 1997) (permitting review of attorney-client materials "[i]n light of the finding of probable cause that had preceded the issuance and execution of the warrant").

[25] United States v. Zolin, 491 U.S. 554, 572 (1989) (quotations and citations omitted).

10

public under [FOIA] . . . ."[26]  The Protective Order does not prevent prisoners from being in possession of FOUO documents; such documents by definition represent no security risks, and there is therefore no reason why a prisoner should not legitimately be in possession of such documents.

Second, the document that is marked with a crossed-out "SECRET" stamp is surely *not* a classified document and therefore should be of no concern to NCIS investigators.  Based on counsel's experience with handling the documents in these cases, it seems quite likely that the document was *once* classified and that – whether by request of counsel or the media, or *sua sponte* by the government – the document was declassified and marked accordingly.  It is typical for such documents to have the original "SECRET" stamp crossed out and "Unclassified" written beside it.  The Protective Order does not prevent prisoners at Guantánamo from legitimately possessing such unclassified documents.

Third, the so-called "knot-tying" document found by the government is not purported to have been labeled "attorney-client material" and is not alleged to have been discovered in a prisoner's privileged legal folder.  The document therefore appears to have no relevance to the instant motion, which seeks review only of privileged items that have been confiscated by government agents.

Fourth, an apparent suicide note that was handwritten on the back of a piece of paper marked "attorney-client privileged" was quite obviously not being "hidden" by any of the prisoners.  The piece of paper was discovered in the mesh of the cell of one of the deceased, not secreted in the privilege folder of any of the prisoners.  If the deceased were seeking to keep this document from the prying eyes of the prison guards by disguising it as a privileged document, it is wholly unlikely that he would place it in the open where it would inevitably be discovered.  Most probably, the prisoner

---

[26]  DoD Regulation 5200.1:C5/2/7/1/1/3 (emphasis added).

11

in fact wanted the note to be discovered and drafted it on the only piece of paper readily available to him. In all likelihood, the only "abuse" of the privilege system was one prisoner's agreement to provide the deceased with a piece of paper from his privilege folder in order to allow him to express his last wishes to his family.

Finally, the government does alert counsel and the Court to a single document that likely should not have been in the possession of a prisoner. Remarkably, the document is an *email from JTF-Guantánamo itself* – a document that obviously was not provided to a prisoner by counsel, since counsel does not have access to such documents. How did this document come into possession of a prisoner? Counsel respectfully suggests that the NCIS inquire of JTF-Guantánamo and its staff, rather than take advantage of JTF-Guantánamo's apparent security breakdown as an excuse to rifle through the privileged papers of every prisoner in the prison.

The government's generalized security concerns are of the type already rejected by the Court. The government, when it sought to justify the real-time monitoring and recording of attorney-client meetings, claimed that the prisoners would use meetings with counsel "to further terrorist operations or otherwise disclose information that will cause immediate and substantial harm to national security."[27] The Court rejected the government's claims, finding them "thinly supported." As for the government's speculation that Petitioners' counsel are improperly sharing classified information with their clients, this Court long ago reminded the government that "the government's decision to grant an individual attorney a security clearance amounts to a determination that the attorney can be trusted with information at that level of clearance."[28]

--------

[27] Al Odah, 346 F. Supp. 2d at 4 n.4.

[28] Id. at 14.

Little has changed – except for the government's new-found concern with suicide prevention. The government introduced interrogation techniques designed to wear down Petitioners' mental health, yet resisted any inquiry into prisoners' health – even as it recorded hundreds upon hundreds of suicide attempts. After driving prisoners to suicide, the government's concern for the mental health of its captives is impossible to take seriously.

## IV.    ANY FURTHER REVIEW OF THE PRISONERS' LEGAL PAPERS SHOULD BE BY THE COURT OR A SPECIAL MASTER.

If the further review of the prisoners' legal papers is allowed, the use of a Department of Defense Filter Team is inappropriate here. As the government hints in its filing, *see* Resps.' Mot. 21 n.12, courts are reluctant to entrust attorney-client privileged materials to such governmental teams. Indeed, "the use of government taint teams has often been questioned or outright rejected by the courts."[29] Just last week, the Sixth Circuit overruled a district court's decision to permit review of potentially privileged documents by an independent government "taint team" because the review posed unacceptable risks to the attorney-client privilege.[30] Even when such teams have been authorized, "at least three courts that have allowed for review by a government privilege team have opined, in retrospect, that the use of other methods of review would have been better."[31]

Especially given the government's history of interfering with the attorney-client relationships in this case, as well as its expressed desire to "exploit the 'intelligence value'" of monitored attorney-

---

[29] In re Search of the Scranton Hous. Auth., No. 04 318-322, 2006 WL 1722565, at *5 (M.D. Pa. June 22, 2006).

[30] In re Grand Jury Subpoenas 04-124-03 and 04-124-05, No. 05-2274/2275, -- F.3d --, 2006 WL 1915386, at **6-7 (6th Cir. July 13, 2006).

[31] United States v. Stewart, No. 02 CR 396, 2002 WL 1300050, at *6 (S.D.N.Y. June 11, 2006).

client communications,[32] "it is important that the procedure adopted on this case not only be fair but also appear to be fair."[33]  Here, "there is no doubt that, at the very least, the 'taint team' procedures create an appearance of unfairness."[34]

The government's motion is a patent attempt to chill attorney-client communications.  In it, the government suggests that "possibly others" – *i.e.*, non-prisoners – may have participated in a "manifest abuse of the legal mail system."[35]  This unfounded assertion is a veiled threat to habeas counsel, designed to deter them from communicating effectively with their clients.  Indeed, buried in a footnote is the government's conclusion that because counsel is prohibited "from sharing . . . certain types of materials with detainees . . . [if] prohibited materials are discovered in the course of review, the Filter Team would not be constrained from bringing the matter to the Court's attention for appropriate action."[36]  Habeas counsel with access to classified information have security clearances, are aware that they work under the shadow of possible contempt and criminal actions, and are all officers of the Court.  There is no warrant for a new team of Department of Defense lawyers to begin scouring the prisoners' legal papers to uncover evidence of suicide "plots."

---

[32] Al Odah, 346 F. Supp. 2d at 10 n.11.

[33] Stewart, 2002 WL 1300059, at *8.

[34] United States v. Neill, 952 F. Supp. 834, 841 n.14 (D.D.C. 1997).

[35] Resps.' Mot. at 10.

[36] Resps.' Mot. at 11 n.10.

**CONCLUSION**

For the preceding reasons, the Respondents' motion should be denied, and Petitioner's motion should be granted.

Respectfully submitted,
 /s/Richard J. Coughlin
Dated:    Newark, New Jersey          Richard J. Coughlin
          July 21, 2006               Federal Public Defender
                                      Chester M. Keller
                                      First Assistant Federal Public Defender
                                      Candace M. Hom
                                      Research & Writing Attorney
                                      Office of the Federal Public Defender
                                            for the District of New Jersey
                                      972 Broad Street, Fourth Floor
                                      Newark, New Jersey 07102
                                      (973) 645-6347
                                      *Counsel for Petitioner*

15