## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AYMEN SAEED BATARFI, et al. | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-cv-0409 (EGS) |
| | ) | |
| GEORGE W. BUSH, et al. | ) | |
| Respondents | ) | |
| —————————————————— | ) | |
| BENJAMIN MOHAMMED AL | ) | |
| HABASHI, et al. | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-cv-0765 (EGS) |
| | ) | |
| GEORGE W. BUSH, et al. | ) | |
| Respondents | ) | |
| —————————————————— | ) | |
| ABDUL WAHAB, | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-cv-0886 (EGS) |
| | ) | |
| GEORGE W. BUSH, et al. | ) | |
| Respondents | ) | |
| —————————————————— | ) | |
| LABED AHMED, | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-cv-1234 (EGS) |
| | ) | |
| GEORGE W. BUSH, et al. | ) | |
| Respondents | ) | |
| —————————————————— | ) | |
| GHASSAN ABDULLAH AL SHARBI, | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-cv-2348 (EGS) |
| | ) | |
| GEORGE W. BUSH, et al. | ) | |
| Respondents | ) | |
| —————————————————— | ) | |
| RAMZI BIN AL-SHIBH, et al. | ) | |

|  |  |  |
|---|---|---|
| Petitioners, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-cv-1725 (EGS) |
| | ) | |
| GEORGE W. BUSH, et al. | ) | |
| Respondents | ) | |
| | ) | |
| AHMED ZAID SALEM ZUHAIR, | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 08-cv-0864 (EGS) |
| | ) | |
| GEORGE W. BUSH, et al. | ) | |
| Respondents | ) | |
| | ) | |
| SHARIFULLAH, et al. | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Civil Action No. 08-cv-1222 (EGS) |
| | ) | |
| GEORGE W. BUSH, et al. | ) | |
| Respondents | ) | |
| | ) | |

## GOVERNMENT'S REPLY BRIEF IN SUPPORT OF BRIEF REGARDING PRELIMINARY AND PROCEDURAL FRAMEWORK ISSUES

## INTRODUCTION

Petitioners largely reject the carefully delineated proceedings of the controlling plurality in *Hamdi* v. *Rumsfeld*, 542 U.S. 507 (2004). Instead, petitioners envision an expansive quasi-criminal proceeding to challenge their detention with wide-ranging discovery and a panoply of procedural rights that are nowhere contemplated by the Supreme Court. Indeed, the Supreme Court, both in *Hamdi*, and *Boumediene v. Bush*, 128 S. Ct. 2229 (2008), called for a much more modest role for the courts in evaluating wartime detention decisions than that proposed by the petitioners. Many of petitioners' proposals ignore or directly contradict the framework for these cases set forward in *Hamdi*, and their proposal for factfinding is anything but "prudent and incremental." *Hamdi*, 542 U.S. at 539. Instead, petitioners' proposals closely resemble the expansive criminal-type procedures that the *Hamdi* district court had ordered but that the Supreme Court reversed as overbroad. The procedures they propose trivialize both the unique circumstance these habeas cases present – where judges will be evaluating the intelligence and information that leads to military actions taken overseas during an active military conflict – and the weighty national security interests that the Supreme Court has repeatedly recognized must be part of the balance.

This context demands a more circumspect role for this Court—one where, to be sure, each petitioner and the Court is provided notice of the Government's basis for detention through the filing of a factual return, but one where: (i) the Court must giver proper weight to the Government's military determination to detain an individual as an enemy combatant by, among other things, presuming the correctness of the information relied upon by the Government in making that military decision, even though it will often be hearsay evidence; (ii) the petitioner is entitled to rebut that showing with his *own* factual submission, but not to seek discovery from the Government; and (iii) the Court must then dismiss the petition unless petitioner's showing is more persuasive than the

Government's. Only if a petitioner makes such a more persuasive showing should this Court consider further evidentiary and factfinding proceedings.

Petitioners rely heavily on the habeas statute and urge that the court should not deviate from it, but nowhere address the fact that *Hamdi* required implementation of much narrower procedures when that same habeas statute clearly was applicable. Now it is not. Thus, in addition to failing to acknowledge that *Hamdi* provided for narrower procedures in this context where the habeas statute applies, they fail to come to terms with the fact that Congress *repealed* that statute and, accordingly, "now there must be constitutionally based jurisdiction or none at all." *Boumediene*, 128 S. Ct. at 2278 (Souter, J., concurring). As we have demonstrated, the *constitutional* requirements for habeas are the applicable rules going forward. In any event, petitioners interpret the statute far more expansively than is warranted and propose a process exceeding what is provided in the habeas statute and rules, particularly in light of *Hamdi*'s implementation of much narrower procedures under the statute. The habeas statute provides for very limited discovery, at most, and summary resolution of the facts – not a norm of free-wheeling discovery, trial-type hearings, and proof beyond a reasonable doubt or by clear and convincing evidence. The habeas statute certainly does not mandate what petitioners demand, but at most allows courts some flexibility in the procedures employed. It would be improper to use this flexibility as a means of requiring criminal trial-like procedures in light of both *Hamdi*'s rejection of such procedures and Congress's judgment (reflected in the DTA and the MCA) that there should be no habeas procedures available at all in this context. Prudent implementation of the habeas statute in this context should be informed by Congress's clear intent for these cases, and thus interpreted to require only the constitutional minimum. Nor is such prudent implementation foreclosed by *Boumediene*, which stressed that "[t]he extent of the showing required of the Government in these cases remains to be determined." 128 S. Ct. at 2271.

Petitioners' proposed procedures are not only inconsistent with *Hamdi*, but also with the

Government's legitimate national security concerns.  For example, petitioners demand that the Government meet the highest possible standard of proof – beyond a reasonable doubt –  to detain an enemy alien even though a much less onerous showing is sufficient to justify even the lethal use of military force abroad.  Moreover, the criminal-like procedures that petitioners propose would routinely require military and intelligence officers to appear in person in testimonial hearings.

Aside from being fatally flawed as a legal matter, petitioners' proposed framework would do nothing to provide a workable construct for this Court to handle multiple habeas petitions. Petitioners ignore the fact that these cases are all quite similar – each involves an enemy alien who has been captured outside the United States as part of military operations in a war with al Qaeda, the Taliban, and associated forces; each has been determined by the Executive to be an enemy combatant in that war; and each is detained abroad.  These circumstances warrant even greater deference than *Hamdi*, which involved a citizen detained within the United States and entitled (unlike petitioners here) to all of the rights afforded by the Constitution and by the modern habeas statute and rules.  Thus, *Hamdi* provides the outer bounds for the process appropriate here.

Procedurally, the way forward is clear.  The path was set out in *Hamdi*, and it calls for a burden-shifting approach and a prudent and incremental response in each of the areas identified by the Court for common resolution.  The Government's proposed framework does just that and gives petitioners their day in Court, without delay.

I.   **PETITIONERS' PROPOSAL REJECTS THE *HAMDI* FRAMEWORK AND CALLS FOR THE QUASI-CRIMINAL PROCESS THAT THE SUPREME COURT REJECTED.**

We have explained why this Court should enter an order implementing the *Hamdi* framework.  Govt. Br. at 6-13.  That framework gives the Court what it must have under *Boumediene*: "the means to correct errors," including "some authority to assess the sufficiency of

the Government's evidence against the detainee"; "the authority to admit and consider relevant exculpatory evidence" that each petitioner may wish to introduce; and "the means [for petitioners] to supplement the record on review."  128 S. Ct. at 2270.  At the same time as it was outlining these habeas essentials, *Boumediene* expressly *rejected* criminal-type proceedings, explaining that "[h]abeas corpus proceedings need not resemble a criminal trial, even when the detention is by executive order."  *Id*. at 2269.   The *Hamdi* Court likewise expressly rejected the imposition of a "process [that] would approach the process that accompanies a criminal trial" including "quite extensive discovery of various military affairs."  *Hamdi*, 542 U.S. at 528.

Despite these plain holdings, petitioners would discard the *Hamdi* framework in favor of a highly intrusive, elaborate, quasi-criminal process.  Such a course would be unprecedented and unworkable.  Petitioners argue that they are entitled to trial-type hearings to resolve *any* disputed issues of material fact, *see*, *e.g.*, Zuhair Br. at 22-25, as if this were a full-blown criminal trial.  But this is a very different proceeding, and the Court must "presum[e]" the Government's "credible evidence" to be correct unless the petitioner puts forward his own "more persuasive evidence." *Hamdi*, 542 U.S. at 534.  This "prudent and incremental" approach is not governed by the Federal Rules of Civil or Criminal Procedure or the Federal Rules of Evidence, but is properly governed by the controlling Supreme Court opinion in *Hamdi*.  *Id*.  Moreover, petitioners envision a fulsome discovery process "more permissive" than that provided in modern statutory habeas cases, Batarfi Br. at 27, and even broader than the discovery that accompanies criminal proceedings. *See id*. at 33 (seeking entry of an order requiring a search of "all . . . evidence . . . in [the Government's] possession" for exculpatory and impeaching material); Habashi, Notice of Supplemental Authorities, at 2 (filed Aug. 28, 2008) (arguing that litigants may seek all reasonably available material); Batarfi Br. at 37 (asserting petitioners' entitlement to take depositions).  Petitioners seek imposition of a duty on the Government even broader than that in criminal cases:  to provide any and all exculpatory

evidence – regardless of who knows about it – and, remarkably, to place upon the United States military and intelligence community an affirmative "duty to learn of any favorable evidence known to the others acting on the government's behalf." Batarfi Br. at 32 (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)). *Hamdi* expressly rejected this sort of broad, criminal discovery. 542 U.S. at 528. Petitioners also argue that while some hearsay may be permitted, the Court should employ a searching standard in evaluating whether it is permissible. Batarfi Br. at 38-45. Again, this is contrary to *Hamdi*, which directed the lower courts to consider hearsay material as the best available evidence, and it gives no regard to the practical limitations imposed by the "rubble of war." 542 U.S. at 532-34. Finally, petitioners appear to suggest that live witness testimony through compulsory judicial process will be the norm and that the right to cross examine Government witnesses – including intelligence and military personnel – be afforded as a matter of course. *See* Batarfi Br. at 36-38. In sum, petitioners propose that this Court adopt a quasi-criminal scheme far greater than even the procedures afforded in the statutory habeas provisions that Congress repealed as to these petitioners. The Court should not accept this invitation for at least three reasons.

First, as just pointed out, an expansive quasi-criminal procedural framework was expressly rejected by the *Hamdi* Court. The district court in that case had refused to rely on hearsay and "ordered the Government to turn over numerous materials for *in camera* review, including copies of all of Hamdi's statements and the notes taken from interviews with him that related to his reasons for going to Afghanistan and his activities therein; a list of all interrogators who had questioned Hamdi and their names and addresses; statements by members of the Northern Alliance regarding Hamdi's surrender and capture; a list of the dates and locations of his capture and subsequent detentions; and the names and titles of the United States Government officials who made the determinations that Hamdi was an enemy combatant and that he should be moved to a naval brig." *See Hamdi*, 542 U.S. at 513-14. That order in *Hamdi* is narrower than the limitless discovery sought

- 5 -

by petitioners here.  But the Supreme Court reversed that order and others, describing the process contemplated by the district court as something that "would approach the process that accompanies a criminal trial" and as "anticipat[ing] quite extensive discovery of various military affairs."  *See Hamdi*, 542 U.S. at 528.  Thus, the Supreme Court squarely rejected this approach even for *citizen* detainees, holding that "the process apparently envisioned by the District Court below" does not "strike[] the proper constitutional balance when a United States citizen is detained in the United States as an enemy combatant."  *Id.* at 532.  Petitioners' proposals for evidentiary hearings, sweeping discovery into military and intelligence matters, and the like, demand an even more burdensome process than that rejected in *Hamdi* as overbroad even for an American citizen detainee.

Second, petitioners' framework seeks to remove from these proceedings any degree of deference to the Executive Branch in carrying out wartime operations.  While agreeing that petitioners are entitled to invoke constitutional habeas corpus, the Supreme Court also recognized that in "considering . . . the procedural . . . standards used to impose detention to prevent acts of terrorism, proper deference *must be accorded to the political branches*."  *Boumediene*, 128 S. Ct. at 2276 (emphasis added).  Petitioners' proposed framework, however, accords no deference to the political branches.  Indeed, petitioners contend that the government bears the burden of proving that petitioners are enemy combatants beyond a reasonable doubt, *see* Zuhair Br. at 17-22, or by clear and convincing evidence, Batarfi Br. at 20-25, and that its decision to detain and supporting evidence are entitled to *no* presumption of validity.  Wahab Br. at 36-40.  These proposals are contrary not only to *Boumediene*'s holding that deference is required, but also to *Hamdi*, which called for an evidentiary showing neither beyond a reasonable doubt nor by clear and convincing evidence, but rather by "credible evidence," and which expressly endorsed a presumption in favor of the Government's evidence in these circumstances.  *Hamdi*, 542 U.S. at 534.

Third, petitioners' course is wholly unprecedented and will prove unworkable given the large

number of habeas petitions at hand.  Indeed, petitioners envision limited coordination and expect judges to decide issues of discovery in an ad hoc manner that will necessarily lead to inconsistent rulings on basic procedural points that all parties should have a strong interest in resolving consistently.  Such a course can only further delay these cases rather than resolve them.  The "prudent and incremental" approach is to require an orderly, manageable process whereby the Government first submits a factual return containing credible evidence that is presumed valid; the petitioner submits a traverse that must contain more persuasive evidence; and that any additional process, taken in incremental steps, is appropriate only if the weight of the evidence supports the petitioner.  To be sure, petitioners will, as the Supreme Court emphasized in *Boumediene*, be able to participate in an adversarial process, have notice of the basis of their detention, and challenge that detention through supplementation of the record with *their* information.  But the Court may properly limit its review as established by *Hamdi*.  The Court should thus enter a case management order implementing the *Hamdi* framework, as proposed by the Government.

Petitioners argue, *see*, *e.g.*, Batarfi Br. at 7, that this Court should disregard the *Hamdi* framework because only four Members of the Supreme Court joined the *Hamdi* plurality's procedural discussion.  But as we explained in our framework brief, Gov't Br. at 11, Justice Thomas's opinion, which would have dismissed the petition because, in his view, the Court had "no right to insist upon" "additional procedural protections," *Hamdi*, 542 U.S. at 579 (Thomas, J., dissenting), was the only other opinion to address "procedural protections" and provided an even *broader* rationale for deference to the Executive.  Thus, the controlling plurality provided the only opinion that can "be meaningfully regarded as 'narrower'" of the five Justices to address the issue.  *King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991).  Justice Souter, on the other hand, declined to address "any questions of what process [Hamdi] may be due in litigating * * * under the habeas statute" (*Hamdi*, 542 U.S. at 553); his opinion therefore cannot be "regarded as 'narrower'" (*King*,

- 7 -

950 F.2d at 781) than the plurality opinion addressing habeas procedures. Indeed, if anything, by leaving the scope of habeas procedures unaddressed, Justice Souter's opinion is also "broader" than the plurality's adoption of focused procedures. More pragmatically, it makes no sense for this Court to ignore procedures outlined for this very situation by a plurality of four justices, especially when Justice Thomas would have imposed no such procedures at all. Doing so would ignore the reasoned judgment of the *Hamdi* plurality and would cause chaos in the administration of these cases at the district court level.

## II.    PETITIONERS' SPECIFIC PROPOSALS ARE INCONSISTENT WITH THE *HAMDI* FRAMEWORK.

### A.    The *Hamdi* Burden-Shifting Approach Is Appropriate In These Cases and Should Be Implemented.

As we explained in our opening brief, this Court should enter an order that implements the *Hamdi* burden-shifting approach in assessing the facts that support the Executive Branch's decision to detain a petitioner as an enemy combatant. Govt. Br. at 6-13. Under that approach, the Government would first "put[] forth credible evidence that the habeas petitioner meets the enemy-combatant criteria." *Hamdi*, 542 U.S. at 534. The petitioner must then rebut that evidence "with more persuasive evidence." *Id.* Only if that more persuasive showing is made will the Court then engage in additional factfinding.

#### 1.    Authority to Detain

As we explained in our opening brief, it is not practical to address the scope of detention authority in a framework order beyond recognizing three principles: First, the Authorization for the Use of Military Force (AUMF) conferred authority on the President to detain enemy combatants. Second, the President must be accorded substantial deference in interpreting that statute and the detention power conferred by it and that authority at the very least includes the definition

promulgated in the CSRT procedures.  Third, the President also has constitutionally conferred power

to detain under Article II, which Congress expressly recognized in enacting the AUMF.  Petitioners

essentially concede that a more specific analysis is inappropriate given that their discussion of

detention authority quickly devolves into an assessment of the particular facts in their specific cases,

*see*, *e.g.*, Batarfi Br. at 13-15, 18-19; Zuhair Br. at 15 – but such a fact-bound assessment must, of

course, await the filing of returns setting out the factual theory for detention.[1]

The President's power to wage war necessarily includes the power to detain those determined

to be enemy combatants.  *E.g.*, *Hamdi*, 542 U.S. at 522.  This power exists, as we explained in our

opening brief, as a matter of the President's independent constitutional authority as Commander in

Chief and is independently supported by the laws of war and Congress's authorization in the AUMF.

Under this authority, the President's power to detain includes at a minimum the ability to detain as

enemy combatants those who are part of or support enemy forces (*e.g.*, al-Qaida, Taliban, and

associated forces), or who have committed a belligerent act or directly supported hostilities against

the United States.  Individuals "who associate themselves with the military arm of the enemy

government" – or enemy organization – "are enemy belligerents," even if "they have not actually

committed or attempted to commit any act of depredation or entered the theatre or zone of active

military operations."  *Ex parte Quirin*, 317 U.S. 1, 37-38.  In any event, as the *Hamdi* plurality made

clear, "[t]he legal category of enemy combatant has not been elaborated in great detail," and "[t]he

permissible bounds of the category will be defined by the lower courts as subsequent cases are

presented to them."  542 U.S. at 522 n.1.  These cases, of course, will provide further clarification

---

[1]Batarfi addresses in detail the authority to detain "civilians."  Batarfi Br. at 14-15.  Such assessment must await the facts of each particular case, but it is important to note that under the laws of war, a civilian is simply defined as an individual who is not a combatant; thus, the term has no independent meaning.  Dinstein, The Conduct of Hostilities Under the Law of International Armed Conflict, at 114 (2004).

of the enemy combatant category.

Petitioner Batarfi argues (Br. at 18-20) that the Government is bound by the theory of enemy combatancy that it proposed as appropriate for assessing whether Parhat was a combatant in *Parhat v .Gates*, 522 F.3d 834, 843 (D.C. Cir. 2008). *Parhat* is obviously inapplicable to this case, in that it involved the D.C. Circuit's review of the CSRT's determination under Defense Department regulations pursuant to the DTA statutory scheme. In this habeas challenge, the question is not whether the Defense Department has properly followed its regulations and made determinations supported by the record before the agency, but whether petitioners are being lawfully detained – a question not limited legally or factually by the Defense Department's prior theory of enemy combatancy. In any event, the test employed in *Parhat* rested on the specific facts and circumstances presented by that case, just as the issue of combatancy in these cases must await an assessment of the facts and circumstances presented in the Government's factual returns. Thus, the *Parhat* holding does not warrant issuance of an order attempting to define the limits of when someone may be detained as an enemy combatant.

### 2.    The Beyond a Reasonable Doubt and Clear and Convincing Evidence Standards Proposed by Petitioners Are Incorrect and Inconsistent with the *Hamdi* Burden-Shifting Approach.

Petitioners argue that military detention is appropriate only if the Government proves beyond a reasonable doubt or, at a minimum, by clear and convincing evidence, that the detainee is an enemy combatant. *See* Zuhair Br. at 17-22; Batarfi Br. at 20-25. Those standards do not apply here.

First, petitioners provide no authority for the revolutionary proposition that the Government must meet the exacting criminal law standard of proof beyond a reasonable doubt in civil habeas review of the military's decision to detain an alien enemy combatant abroad. The Supreme Court has made clear that the reasonable doubt standard "historically has been reserved for criminal

cases," and the Court has refused to require that standard in non-criminal cases even when an individual's liberty interest is at stake. *See Addington v. Texas*, 441 U.S. 418, 427-428 (1979) (beyond a reasonable doubt standard is not required in civil commitment cases).

Second, petitioners' contention that the reasonable doubt standard should apply because of the weightiness of petitioners' liberty interest and the risk of error fails to consider the Government's countervailing interest in ensuring that those who have fought with or supported the enemy during a war do not return to battle against the United States. Moreover, the reasonable doubt standard is incompatible with the practical difficulties of determining who is an enemy combatant in a foreign war zone where collecting evidence according to criminal law standards is not possible. Finally, petitioners' contention is inconsistent with *Hamdi* and *Boumediene* which each specifically rejected applying quasi-criminal standards in this context. *Boumediene*, 128 S. Ct. at 2269 *Hamdi*, 542 U.S. at 532-33.

Petitioners contend that, even if the reasonable doubt standard does not apply, the government must prove its case by clear and convincing evidence. *See*, *e.g.*, Batarfi Br. at 20-25. That contention is also inconsistent with the standard set forth in *Hamdi*. Moreover, it is grossly at odds with a habeas court's traditional role in reviewing the factual basis for Executive detention decisions. Indeed, petitioners urge that this Court apply substantive standards used in other detention contexts, but ignore *this* context, namely, how much evidence justifies a soldier's military decision to apprehend an apparent enemy in the field rather than allow him to potentially return to battle. The answer to that question is far different from the question presented in any of the domestic proceedings cited by the petitioners, such as civil commitment or pre-trial detention, where the stakes are lower and the setting is more controlled. In the wartime detention context, the consequences of even a single erroneous release can be catastrophic. *See* Mintz, John, *Released Detainees Rejoining The Fight*, Washington Post (Oct. 22, 2004) ("One of the repatriated prisoners

is still at large after taking leadership of a militant faction in Pakistan"; he had "maintained the fiction that he was an innocent Afghan tribesman" while at Guantanamo); Rubin, Alissa, *Former Guantanamo Detainee Tied to Attack*, New York Times (May 8, 2008) (reporting that "[a] former Kuwaiti detainee at the United States prison camp at Guantanamo Bay, Cuba, was one of the bombers in a string of deadly suicide attacks in the northern Iraqi city of Mosul last month"). Moreover, because of the difficulties inherent in gathering and presenting evidence from a war zone sufficient to meet the high standards of proof proposed by petitioners, a disproportionate risk of error would be transferred to our soldiers overseas.  Petitioners' proposal would strip the military of authority to detain enemies unless their status as enemy combatants can be established by exacting standards created for domestic, peacetime criminal court proceedings, with the result that our soldiers' ability to protect themselves and our allies would inevitably be diminished, and the dangers they face would as a result be increased.

The Supreme Court in *Hamdi* set forth the standard that the Government must meet to satisfy a habeas Court's inquiry into the factual basis for detention – if the Government "put[s] forth *credible evidence* that the habeas petitioner meets the enemy-combatant criteria" it has met its factual burden.  *Hamdi*, 542 U.S. at 534 (emphasis added); *see id.* ( court must "give due regard to the Executive once it has put forth meaningful support for its conclusion that the detainee is in fact an enemy combatant").  This standard is a far cry from the "beyond a reasonable doubt" and "clear and convincing evidence" standards proposed by petitioners.  Because petitioners' proposed evidentiary standards are flatly inconsistent with *Hamdi*, and with the real-world exigencies of wartime conditions, they must be rejected.

**3.    The Government's Evidence is Entitled to a Presumption of Validity.**

Petitioners urge that no presumption in favor of the Government's evidence is appropriate. *See* Wahab Br. at 36-40.  But this contention is directly contrary to *Hamdi*, which expressly

- 12 -

endorsed just such a presumption for a wartime detention in a context that is different only in that, there, *more* constitutional protections applied. Even in that context where the detainee, as a citizen, was afforded the full panoply of constitutional protections, the Court stated that "the Constitution would not be offended by a presumption in favor of the Government's evidence, so long as that presumption remained a rebuttable one and fair opportunity for rebuttal were provided." *Hamdi*, 542 U.S. at 534. That ability to rebut, the controlling plurality explained, "would sufficiently address the 'risk of an erroneous deprivation' of a detainee's liberty interest" and therefore satisfy the requirements of the Due Process Clause in protecting the liberty interest of a United States citizen. *Id.* (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). *A fortiori* such a presumption is appropriate here, where the detainees are not citizens, constitutional protections are therefore lesser, and the habeas statute is inoperative except as constitutionally compelled.

Petitioners argue that a presumption is not warranted because the Court in *Boumediene* directed that there be plenary habeas review into the sufficiency of the Government's evidence. Wahab Br. at 38-39. But sufficiency review is deferential even in less sensitive contexts than here, *see Jackson v. Virginia*, 443 U.S. 307, 319 (1979), and the fact that this Court will be conducting a review of the sufficiency of the Government's evidence to warrant detention is in no way inconsistent with according that evidence a presumption of validity. In those circumstances, if the Government's evidence is not more persuasively rebutted, the Court will simply perform the familiar task of determining whether that evidence, presumed true, is sufficient to support the conclusion that the detainee is an enemy combatant. *Cf. id.* (in reviewing sufficiency of evidence supporting criminal conviction, court "view[s] the evidence in the light most favorable to the prosecution"); *United States v. Pettiford*, 517 F.3d 584 (D.C. Cir. 2008) (applying sufficiency of evidence review in criminal case).

Petitioners also contend that *Boumediene* directly rejected a presumption in favor of the

Government's evidence.  Wahab Br. at 38 (citing *Boumediene*, 128 S. Ct. at 2260, for the proposition that a central defect of the CSRT is that the "Government's evidence is accorded a presumption of validity").  This contention is wrong.  The Court nowhere addressed the *Hamdi* Court's holding that a presumption by the habeas court is appropriate.  Instead, the Court was expressing concern over an administrative presumption that was all-but irrebuttable.  *Boumediene*, 128 S. Ct. at 2260.  There, the detainee's "ability to rebut the Government's evidence against him" was limited by the absence of counsel in CSRT proceedings, the rigorously enforced limits on what "reasonably available" evidence a detainee could request, *see* CSRT procedures, Enc. 1, § (G)(2), and the fact that he could submit no exculpatory evidence in subsequent court proceedings under the DTA.  *Boumediene*, 128 S. Ct. at 2260.  Here, on the other hand, the presumption is fully rebuttable by the petitioner who, with counsel, will have an adequate opportunity to present all of his own evidence.  In such circumstances, the *Hamdi* "presumption in favor of the Government's evidence" is entirely appropriate.  542 U.S. at 534.

The presumption is also appropriate given the nature of much of the evidence to be presented.  In many cases, evidence will be derived from intelligence that experts in the intelligence agencies and the military deem reliable for purposes of conducting military operations – which may involve the use of lethal force.  It is, thus, entirely appropriate to defer to their expertise with such information and their assessment.  Indeed, judges have "little or no background in the delicate business of intelligence gathering" and "[t]here is no reason . . . to have great confidence in the ability of judges to make" intelligence-related judgments correctly.  *CIA v. Sims*, 471 U.S. 159, 176 (1985).

Petitioners also claim that a presumption is improper because, in their view, a CSRT determination is entitled to no deference because the CSRT represents factual determinations by executive officials rather than a "court of record."  Wahab Br. at 37.  Petitioners also cite various

historical cases where courts "declined to defer" to a detention decision, but instead conducted de novo review. *Id.* at 39 (citing *Ex Parte Bollman*, 8 U.S. 75, 125 (1807)). But the issue of deference to a CSRT administrative determination (or the magistrate's determination in *Bollman*) has no relevance to whether the Government's factual evidence is entitled to the presumption endorsed by *Hamdi*. There were no CSRTs at the time *Hamdi* was decided, and *Hamdi* endorsed a presumption in favor of the government's evidence. *Id.* at 534-35. In any event, the Court in *Hamdi* also reasoned that deference is appropriate in these circumstances, as a Court must "giv[e] due regard to the Executive once it has put forth meaningful support for its conclusion that the detainee is in fact an enemy combatant." *Id.* at 534.[2]

Petitioners also cite the D.C. Circuit's decision in *Parhat v. Gates*, 532 F.3d 834 (D.C. Cir. 2008) in support of their claim that an evidentiary presumption is inappropriate. Wahab Br. at 38; Zahair Br. at 26-27. That contention misapprehends both the nature of the presumption endorsed by *Hamdi* and the holding of *Parhat*.

In *Parhat*, the D.C. Circuit considered whether the evidence before the CSRT was sufficient to support its determination that Parhat was an enemy combatant, according to the standards and procedures for CSRT's established by the Secretary of Defense. 532 F.3d at 841-42. As the court acknowledged, among those standards and procedures is a "rebuttable presumption that the

_____

[2]While it is outside the scope of this procedural briefing, it is well established that, on the merits, the military's detention decision must be afforded substantial deference. *See id.*; *Hirota v. MacArthur*, 338 U.S. 197, 215 (1949) ("the capture and control of those who were responsible for the Pearl Harbor incident was a political question on which the President as Commander in Chief, and as spokesman for the nation in foreign affairs, had the final say"); *Aguayo v. Harvey*, 476 F.3d 971, 978-79 (D.C. Cir. 2007) (noting "the limited scope of review in military habeas cases" where "considerable deference" is appropriate); *Doe v. Sullivan*, 938 F.2d 1370, 1380 (D.C. Cir. 1991) ("The Supreme Court has cast the principle of judicial deference to the electoral branches in military matters in broad terms."); *Thomasson v. Perry*, 80 F.3d 915, 924-26 (4th Cir. 1996). *Bollman*, a case involving a routine pre-trial detention judgment in a domestic criminal case, is of no relevance to the deference with which a civilian court must review the military's determination to detain an alien enemy combatant in wartime.

Government evidence is genuine and accurate."  *Id*. at 841 (internal quotation marks omitted).

Although the court ultimately determined that the evidence was not sufficient, that ruling in no way

overruled, conflicted with, or even questioned the presumption in favor of the Government's

evidence that the court recognized.  Indeed, in announcing its conclusion that the Government's

hearsay evidence must contain sufficient information to permit the court to assess its reliability, the

court specifically stated that this conclusion was entirely consistent with a rebuttable presumption

in favor of the Government's evidence:

> [T]he factfinder must evaluate the raw evidence, finding it to be sufficiently reliable
> and sufficiently probative to demonstrate the truth of the asserted proposition with the
> requisite degree of certainty.  Both the obligation and the requirement likewise flow
> from the [Secretary of Defense's] establishment of a *rebuttable* presumption that the
> Government Evidence is genuine and accurate.
>  . . . .
> [I]n order to ensure, as the DTA requires, that the conclusion of the [CSRT] is
> supported by a preponderance of the evidence, allowing only a rebuttable presumption
> in favor of the Government's evidence, we must be able to assess the reliability of that
> evidence ourselves.

*Id*. at 847-48 (internal citations and quotation marks omitted) (emphasis in original).  Thus, far from

rejecting a rebuttable presumption in favor of the Government's evidence, the Court specifically

acknowledged and allowed that presumption, and tailored its review of the evidence to ensure that

the presumption was genuinely rebuttable.  Moreover, *Parhat* recognized such a presumption in

circumstances where the detainee had only a limited opportunity to rebut the presumption with his

own evidence.  *A fortiori*, the *Hamdi* presumption is appropriate in these habeas cases where the

detainee has a full opportunity – with the assistance of counsel – to rebut the government's showing.

*See Boumediene*, 128 S. Ct. at 2260 (in addressing CSRT process, expressing concern over

petitioner's "ability to rebut the Government's evidence" that is presumed valid).  Accordingly,

petitioners' contention that *Parhat* somehow forecloses a rebuttable presumption in favor of the

Government's evidence is simply incorrect.

**B.      CSRT Decisions May Be Submitted To This Court in Factual Returns.**

As we explained in our framework brief, the CSRT decision in these cases could provide important information that the Government may include in its factual return. One petitioner argues that the CSRT decision should be inadmissible, but provides no cogent reason why the relevant administrative determination of combatancy could not be included in the factual return that is before this court. Batarfi Br. at 25. *But see* Wahab Br. at 37 (agreeing that CSRT decision may be included as part of the government's return); Zuhair Br. at 46 (not arguing for exclusion of CSRT decision). Accordingly, this Court should not preclude CSRT decisions from being included as part of the Government's factual return.

**C.      There is No Entitlement to Discovery in these Proceedings.**

Discovery into military affairs by those who have been determined to be our enemies poses unique risks to our nation's security. As another district court judge recognized in a related context, the "discovery process alone risks aiding our enemies by affording them a mechanism to obtain what information they could about military affairs and disrupt command missions by wresting officials from the battlefield to answer compelled deposition and other discovery inquiries." *In re Iraq and Afghanistan Detainees Litigation*, 479 F. Supp. 2d 85, 105 (D.D.C. 2007).

**1.      A Framework Order Precluding Discovery Should Be Entered.**

As we argued in our opening brief, petitioners are not entitled to discovery in these proceedings, and it should be precluded by court order. Going back to the founding, there is no history of discovery in habeas cases (or in civil cases generally, where it was an innovation with the Federal Rules of Civil Procedure) that could possibly give rise to a right to discovery in constitutionally-based habeas proceedings. Govt. Br. at 22-26. The Court in *Boumediene* did not identify discovery as one of the essential elements of constitutional habeas. Congress's repeal of

statutory habeas jurisdiction, in conjunction with the fact that constitutionally-derived habeas corpus does not require discovery, is therefore fatal to the claim that discovery, much less discovery more extensive than that in statutory habeas, is appropriate in these proceedings.

The rules adopted by the Supreme Court to govern statutory habeas proceedings set a *ceiling*, not a floor, for proceeding under *constitutional* habeas. And even if the habeas statute did apply, the Court's application of it should be guided by Congress's unmistakable intent to limit these habeas proceedings, as expressed in the DTA and MCA. Accordingly, while petitioners are entitled to provide their own evidence and version of events for this Court's consideration, any discovery they may be granted from the Government is a matter of Executive discretion rather than a constitutional entitlement.

Petitioners argue for *no framework limits* on discovery. *See* Batarfi Br. at 26-30. That proposal cannot stand in light of the fact that no discovery is authorized in these proceedings. Petitioners' contention is also flatly incompatible with *Hamdi*'s application of the habeas statute. In support of their proposal for essentially unlimited discovery, petitioners cite the *Hamdi* decision's description of the discovery authorized by 28 U.S.C. § 2246. Batarfi Br. at 26 (claiming that petitioners are "entitled to 'the taking of evidence in habeas proceedings by deposition, affidavit or interrogatories'") (quoting *Hamdi*, 542 U.S. at 525). But this citation lends no support to petitioners' request for unrestricted discovery. As we have explained, although *statutory* habeas was available in *Hamdi*, only *constitutional* habeas is available here. In any event, even the habeas statute does not *require* a court to permit discovery. Indeed, discovery is unquestionably the exception, not the norm, in statutory habeas cases in peacetime – and is all the less appropriate here given both the wartime context and Congress's clear intent to limit procedures to the constitutional minimum. Moreover, the *Hamdi* Court quoted the habeas statute on its way to *reversing* the district

court's discovery order and *limiting* when additional factfinding would be appropriate, *i.e.*, only after a court concludes that a petitioner has successfully rebutted the Government's showing. And even then, as *Hamdi* directed, any such factfinding must be "prudent and incremental" and cannot be as broad as that available in criminal proceedings.

Petitioners also cite statutory habeas cases to argue that no framework order is appropriate addressing discovery because the issue whether discovery is appropriate depends on "the facts of a particular case." Batarfi Br. at 27 (citing *Bracy v. Gramley*, 520 U.S. 899, 909 (1997)). However, the proper guidance for constitutionally required procedures in habeas review of wartime detention of alien enemy combatants apprehended overseas is found in *Hamdi*, not in ordinary, domestic statutory habeas cases. The *Hamdi* Court, after weighing the competing considerations, set forth a burden-shifting framework. Under *Hamdi*, as we have explained, no discovery or other factfinding procedures are appropriate, even under the habeas statute and modern habeas practice, prior to a Court employing the burden-shifting framework. Thus, the balance on discovery has already been struck even for statutory habeas cases of this type, and petitioners should not be allowed to evade the *Hamdi* framework by simply citing the general principle that the propriety of discovery depends on the facts and circumstances presented.[3]

Contrary to petitioners' claim, the "unique challenges . . . in gathering evidence" do not support authorizing discovery. Batarfi Br. at 29. Those challenges arise from the wartime context of these cases, which calls emphatically for *limiting* or *precluding* discovery, as *Hamdi* itself reasoned. 542 U.S. at 533. As *Hamdi* explained, "the exigencies of the circumstances may demand

---

[3]Petitioners' request to have discovery that is "more permissive" than in statutory habeas cases (Batarfi Br. at 27) should be rejected out of hand, given *Hamdi*. So should petitioners' claim that the scope of discovery should be guided by the "full opportunity for discovery pursuant to state or federal rules of criminal procedure," *id.*, the precise type of discovery explicitly rejected in *Hamdi*. 542 U.S. at 528, 532.

that, aside from these core elements, enemy-combatant proceedings may be tailored to alleviate their uncommon potential to burden the Executive at a time of ongoing military conflict."  *Id*.  The first "tailoring" performed by the Court was reversing the district court's broad discovery order and imposing the *Hamdi* burden-shifting framework.  The Court thus has already rejected petitioners' suggestion that "preliminary discovery" may be needed to "identify the evidence that is helpful to their case."  Zuhair Br. at 35.

As we explained in our opening brief, even if discovery were constitutionally required, it should occur only very rarely, and only after considering the factual return and traverse.  Further, each specific discovery request must be approved by the district court, as is contemplated by rules for statutory habeas.[4]  The discovery authorized must be incremental under *Hamdi* and *Boumediene*.  *See Hamdi*, 542 U.S. at 539 (factfinding must be "both prudent and incremental"); *Boumediene*, 128 S. Ct. at 2262 ("habeas corpus procedures" should be "modified to address" "practical barriers").  Discovery that is not both extraordinarily rare and narrow is also antithetical to the expedited disposition of the numerous cases at issue.

To this end, even if it were ever permissible, a discovery request would have to be quite specific:  It must "provide reasons for the request" and "include any proposed interrogatories and requests for admission, and must specify any requested documents."  Habeas Rule 6(b).  Even under modern habeas practice, when a petitioner makes such a request, it is his burden to show, based on "specific allegations," that "if the facts are fully developed" he may be "entitled to relief."  *Bracy*, 520 U.S. at 908-09 (quotation marks omitted).  The request must be appropriately "incremental":  first, an expansion of the record pursuant to habeas Rule 7; limited interrogatories or requests for admission that may be answered by any appropriate Government personnel; document requests must

---

[4]Some petitioners agree that discovery "requires leave of court."  Zuhair Br. at 34.

be considered only after requests for admission, and must be narrow and focused on specific documents, not open-ended. Such concerns, and the exigencies of considering so many cases on an expedited basis, strongly militate against open-ended discovery even if, in some rare cases, it may be constitutionally required.

      2.      **The Government Will Voluntarily Submit Evidence Discovered by its Attorneys in Preparing the Factual Return that Materially Undermines the Information Presented in the Return to Support the Petitioner's Classification, But Cannot Properly Be Ordered to Provide Exculpatory Information.**

In our opening brief, we explained that, although not constitutionally required, the Government would submit any evidence that tends materially to undermine information presented in the return to support a petitioner's classification as an enemy combatant, which is encountered in developing the returns by the attorneys preparing them (including the Department of Justice attorneys assigned to the case and those Department of Defense attorneys working on the case with them). This voluntary disclosure would make further discovery unnecessary and inappropriate, even if some discovery were constitutionally required. The Government plans to provide this information even though the *Hamdi* plurality expressly *rejected* the imposition of a "process [that] would approach the process that accompanies a criminal trial" including criminal discovery that is delineated by a prosecutor's *Brady* obligation. *See Hamdi*, 542 U.S. at 528, 532-33.

Petitioners seek a court order requiring the Government to provide all "'exculpatory' and 'impeaching' material in its possession." Batarfi Br. at 33. This order cannot properly be imposed and, in any event, is overbroad and unduly burdensome. It is difficult to overstate the burden such a requirement would impose—effectively forcing the military and intelligence agencies to redirect massive resources from protecting our national security to a limitless fishing expedition, in which they would be obligated to search countless databases for any shred of information that might arguably be considered "exculpatory" or "impeaching." *See Bismullah v. Gates*, No. 06-1198,

Petition for Rehearing En Banc, at 8-10 (D.C. Cir., filed Sept. 7, 2007) (submitting declarations from the military and intelligence community explaining that a search for material on a detainee results in "tens of thousands, and in many cases hundreds of thousands, of documents . . . little of which has anything to do with the detainee or his enemy combatant status").

Further, such an order cannot properly be imposed for the reasons we explained in our opening brief. First, there is *no Brady* obligation in civil proceedings, including statutory habeas proceedings. It would be extraordinary to impose one outside of the criminal context, for the first time, in a case involving wartime detention where any disclosures could potentially threaten national security. *See In re Iraq and Afghanistan Detainees Lit.*, 479 F. Supp. 2d at 105.[5]    Second, the Government's voluntary undertaking, while narrower than *Brady*, still goes well beyond what *Hamdi* anticipated. *See* 542 U.S. at 528, 532. Third, there is no constitutionally-based requirement for discovery in habeas cases *at all*, much less a constitutionally-based requirement for *Brady* type disclosures (which after all was developed well after 1789). And, as we explained, the *Brady* obligation stems from the Fifth Amendment's due process obligations in domestic *criminal* cases; it has no application either to habeas cases or to these petitioners.

One petitioner has suggested that he is entitled to "all exculpatory information" or even "all information" relating to the petitioner based upon the court of appeals' recent reinstatement of its decision in *Bismullah v. Gates*, 501 F.3d 178 (D.C. Cir. 2007). *See Habashi*, Notice of

---

[5]One petitioner (Batarfi Br. at 32) cites *Demjanjuk v. Petrovsky*, 10 F.3d 338, 353 (6th Cir. 1993), in support of applying *Brady* obligations outside of the criminal context. But that decision has been specifically limited to its unique circumstances by the Sixth Circuit, *In re Drayer*, 190 F.3d 410, 414 (6th Cir. 1999), has not been followed by other circuits, and in any event it applied a *Brady* obligation in a denaturalization or extradition case only when that action was "based on proof of alleged criminal activities of the party proceeded against." *Id.* Here, on the other hand, there are no criminal allegations at issue in these proceedings and incorporating criminal-type process has been specifically rejected by *Boumediene* and *Hamdi*. *Boumediene*, 128 S. Ct. at 2269; *Hamdi*, 542 U.S. at 528.

Supplemental Authorities, at 2 (filed Aug. 28, 2008). But, the reinstatement of *Bismullah* is of no relevance to these habeas proceedings. As we explained in our framework brief, Gov't Br. at 30-31, the court of appeals was addressing a unique statutory and procedural scheme in circumstances where it felt it had to police the development of the administrative record in a non-adversarial proceeding. Here, on the other hand, petitioners will directly participate in developing the record before this Court. The reasoning in *Bismullah* is therefore wholly inapplicable.

Petitioners' proposal is breathtakingly overbroad and burdensome. While the Government has no quarrel with providing evidence that is truly "exculpatory," in the sense that it tends materially to undermine information presented in the return to support the petitioner's classification as an enemy combatant, it should only provide that evidence when it is encountered in developing the returns by the attorneys preparing them. The Government cannot and should not be forced to conduct open-ended searches for such material. As we explained, such a search is not constitutionally required because no *Brady* obligation attaches in the context of these civil habeas proceedings in wartime. Further, such a search is not relevant to the core function of habeas identified by *Boumediene*, *i.e.*, giving a *petitioner* the opportunity to make his own factual showing with his own evidence. Such a search obligation is also contrary to *Hamdi*, where the "quite extensive discovery" of criminal proceedings was rejected. 542 U.S. at 528. Finally, such an approach would be extraordinarily burdensome in a time of ongoing war. The United States military and intelligence agencies cannot be required to devote enormous resources in a time of war to literally hundreds of worldwide evidentiary fishing expeditions. That burden is not alleviated by the fact that the Government is reviewing government files to update returns because this review is being conducted by the attorneys who are preparing the returns.

Petitioners must rely extensively on *Brady* and other domestic criminal cases in insisting on

mandatory disclosure of all exculpatory and impeaching evidence.  *See* Batarfi Br. at 32-33. However, in *Boumediene*, the Supreme Court did not consider, nor did it remotely suggest, that a mandatory *Brady* obligation would be appropriate in civil habeas review of military detention of alien enemy combatants abroad.  Instead, it rejected the procedures that accompany a "criminal trial," *id.* at 2269, and *Hamdi* expressly rejected criminal-type discovery procedures.  542 U.S. at 528, 532-33.  In sum, because there is no *Brady* obligation in this context, the Court cannot create one and impose it on the Government.

## III.    IN THE NORMAL COURSE, THE FACTS SHOULD BE RESOLVED BASED UPON THE WRITTEN RECORD.

### A.    Evidentiary Hearings Should Occur Only Rarely.

As we explained in our opening brief, evidentiary hearings, if they occur at all, should occur only rarely.  First, there is no constitutional entitlement to such a hearing in these circumstances and there is nothing unusual about resolving habeas cases based upon the written submissions.  Second, neither *Hamdi* nor *Boumediene* suggested that a testimonial hearing would be appropriate or required in these circumstances.  Instead, *Hamdi* makes clear that evidentiary hearings with live testimony would be improper.  *See* 542 U.S. at 531-32 (soldiers should not be distracted from "the serious work of waging battle" to provide eyewitness accounts of actions that occurred half a world away).  Third, routine hearings would make it all but impossible to resolve these cases promptly. Accordingly, an evidentiary hearing would be appropriate, if at all, only after the Court has reviewed the parties' written submissions and only once a court determines that, absent an evidentiary hearing, the weight of the evidence supports the habeas petitioner.  *See* Gov't Br. at 37-40.

Petitioners' proposal, on the other hand, calls for testimonial hearings to be routine – to be held in all cases where there is any disputed issue of material fact.  Such an approach does not square with the *Hamdi* burden-shifting framework, which requires that a petitioner first rebut the

Government's credible evidence with "more persuasive evidence." *Hamdi*, 542 U.S. at 534. Thus, prior to *any* additional factfinding (and *well before* an evidentiary hearing is required), a petitioner must furnish evidence that is more persuasive than the Government's evidence – he cannot merely assert that there is a factual dispute or rest upon a general denial. If the evidence submitted by a petitioner is *not* more persuasive, the court must resolve the facts in favor of the Government's showing under *Hamdi without* holding an evidentiary hearing, and instead move on to any legal challenges raised by the petitioner. Petitioners' approach, by contrast, is even inconsistent with statutory habeas standards outside of the context of wartime detention. 28 U.S.C. § 2243 (court authorized by habeas statute to "summarily hear and determine the facts, and dispose of the matter as law and justice require").

**B.    The Confrontation Clause Does Not Apply and Compulsory Process Is Unavailable**

Petitioners urge that the baseline assumption will be a right to cross-examine witnesses and have the Court compel attendance of live witnesses at a hearing and order depositions for those outside of this jurisdiction under Federal Rule of Civil Procedure 45. *See* Batarfi Br. at 36-38.[6] The Supreme Court has held that the discovery rules of the Federal Rules of Civil Procedure have only very limited application in ordinary statutory habeas cases. *Harris v. Nelson*, 394 U.S. 286, 292-98 (1969). And, of course, in light of that very limited applicability, *see* Fed. R. Civ. P. 81(a)(2), their application to constitutional habeas review of military detention of alien enemy combatants abroad is limited to that minimum of process required by the Constitution itself. Petitioners also assert that the baseline right to confrontation exists by relying principally upon cases where a *constitutional*

---

[6] The Rule 45 process itself is wholly inappropriate as a procedural framework mechanism. Under Rule 45, a petitioner could obtain a subpoena compelling a witness's presence, and perhaps documents, merely by issuing a subpoena and without any court approval. It would then place the burden on the Government to object. This is the exact opposite of the proper baseline even in statutory habeas proceedings, where court approval for any discovery request is required.

right to confrontation applied due to the Sixth Amendment.  That is clearly wrong because the Sixth Amendment simply does not apply outside of criminal cases.  As to petitioners' assertion that the right of confrontation has been adopted outside of the criminal context in some circumstances, *see* Batarfi Br. at 37-38, those cases rest on the Fifth or Fourteenth Amendment Due Process Clauses or on statutory rights.  But as we have explained, the Fifth Amendment has no application (or reduced application) to aliens held outside the United States; and, in any event, our proposed procedures are consistent with the Fifth Amendment as construed in *Hamdi*.  And, as we explained in our opening brief (Gov't Br. at 42-43) and contrary to the contention of some petitioners, *e.g.*, Zuhair Br. at 46, this Court cannot require the Government to bring a petitioner into the United States.

Finally, as to the assertion that a petitioner should be permitted to argue that evidence be excluded, *see* Batarfi. Br. at 38, the Court must reject this invitation.  While petitioners should be free to argue that particular evidence should be given less weight by the Court, a categorical right to exclude evidence is wholly improper.  In short, while exclusionary rules might be appropriate for criminal proceedings, they do not apply to the conduct of a war.  The Government has a right under *Hamdi* to justify detention using "documentation regarding battlefield detainees already . . . kept in the ordinary course of military affairs."  542 U.S. at 534-35.  Nothing in *Hamdi* or any other authority compels the exclusion of information from the factual return.

### C.      Hearsay Is Admissible In These Proceedings.

While resisting a uniform rule on the admission of hearsay, petitioners concede that it is well within the district court's discretion to admit such evidence.  *See* Batarfi Br. at 38-42; *see id*. at 44 (conceding that under habeas statute, petitioner may "present an answering affidavit").  Thus, at most, petitioners' arguments suggest that, as the Government has argued, the real issue is the weight

that this Court give hearsay evidence, rather than the mere admission of hearsay into evidence.

Petitioners' legal arguments on limiting hearsay are also not meritorious. Even in ordinary statutory habeas cases, the habeas statute specifically authorizes the taking of evidence by affidavit as well as the submission of documentary evidence, *i.e.*, the sort of hearsay that will form the core of the factual submissions in these cases. 28 U.S.C. §§ 2246-47. Thus, petitioners' insistence (*see*, *e.g.*, Batarfi Br. at 39) upon the application of limitations on hearsay in the Federal Rules of Evidence must be rejected. *See* Federal Rule of Evidence 1101(e) (Federal Rules of Evidence apply in statutory habeas proceedings only "to the extent that matters of evidence are not provided for in the statutes which govern procedure therein"). Moreover, because these proceedings are brought under the Constitution rather than under § 2241, section 1101(e) does not incorporate the evidence rules at all. *Id.* (incorporating evidence rules only "[i]n the following [listed] proceedings").

Petitioners' proposal to limit hearsay to that provided by the rules of evidence also cannot be reconciled with *Hamdi*. The *Hamdi* Court stated plainly that hearsay may be relied upon in these kinds of military detention habeas proceedings. In *Hamdi*, 542 U.S. at 533-34, the plurality addressed the competing interests at issue, recognizing that petitioners be afforded "a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker[,]" *id.* at 533, and that this opportunity be "'appropriate to the nature of the case'" *Id.* (quoting *Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 542 (1985)). But these habeas proceedings must also, because of "the exigencies of the circumstances," "be tailored to alleviate their uncommon potential to burden the Executive at a time of ongoing military conflict" and, thus "[h]earsay, for example, may need to be accepted as the most reliable available evidence from the Government in such a proceeding." *Id.* at 533-34.

Petitioners insist that the Court was "merely acknowledging that courts have discretion to

admit affidavits under 28 U.S.C. § 2246 or other hearsay under Rules 803 through 807 of the Federal Rules of Evidence." Batarfi. Br. at 39. This cannot be reconciled with the reasoning of *Hamdi*, which tailored proceedings to address the unique burden of *these very circumstances*. If the *Hamdi* plurality had intended that the Federal Rules of Evidence were to apply to these proceedings, it would have surely mentioned the rules. *Hamdi*, 542 U.S. at 533-34. Indeed, petitioners' interpretation of *Hamdi* effectively reads out the controlling plurality's understanding that these proceedings need to be "tailored" to account for the Government's recognized interests and the plurality's acknowledgment that hearsay is not only admissible, but may be "*the most reliable*" evidence. The plurality's recognition that hearsay may be the *most* reliable evidence establishes that it contemplated a framework outside of the Federal Rules of Evidence.[7]

While styled as challenges to the admissibility of hearsay, petitioners' arguments, in fact, go to the issue of the weight the Court should grant such evidence. Thus, petitioners ask the Court to consider liberty interests and the alleged risk of error, Batarfi Br. at 40, but these go to weighing the evidence, not whether it should be received. *See, e.g.*, *Harter v. United States*, 871 F.2d 1140, 1143-44 (D.C. Cir. 1989). Likewise, petitioners propose that the Court, before accepting hearsay evidence

---

[7]Indeed, the common law exceptions to the hearsay rule arose from prudential considerations similar to those at issue here. The primary impetus behind the most common hearsay exceptions has been the judiciary's recognition that it is simply too burdensome or impractical to call a live witness to testify. For example, the exception for documents created by public officials, *see* Fed. R. Evid. 803(8), arose out of criteria at play in these habeas proceedings, the "presumption of a proper performance of official duty," the "great likelihood that a public official would have no memory at all respecting his action," and the "inconvenience of calling to the witness stand . . . government officers." *Wong Wing Foo v. McGrath*, 196 F.2d 120, 123 (9th Cir. 1952). The "uncommon potential to burden the Executive at a time of ongoing military conflict," *Hamdi*, 542 U.S. at 533 that these proceedings create would be greatly exacerbated by requiring live testimony from a person with first hand knowledge relating to the capture of a detainee outside of the United States. This provides a more compelling reason to provide for an exception to hearsay than to alleviate the burdens placed upon private businesses and public officials. *See id.* at 538-39 ("We anticipate that a District Court would proceed with the caution that we have indicated is necessary in this setting, engaging in a factfinding process that is both prudent and incremental.").

from the Government, must "assess the reliability of the source and [] determine that the information presented is credible." Batarfi Br. at 41.[8] Such a preliminary assessment is unnecessary, because the Court is fully capable of making these assessments *after* this evidence is accepted.[9] In any event, credibility determinations are a matter of weight not admissibility. *See, e.g.*, *United States v. Hamilton*, 334 F.3d 170, 186-87 (2d Cir. 2003) (credibility of hearsay declarant "goes to the evidence's weight rather than to its admissibility"). Thus, petitioners' approach, which would exclude hearsay evidence absent a "specific, targeted showing" of an undue burden on the Government, Zuhair. Br. at 33, is contrary to *Hamdi*, which assumed that hearsay would be appropriate for the reasons that we have identified.

## CONCLUSION

For the foregoing reasons and the reasons provided in the Government's opening brief, we respectfully request that the Court enter the Government's proposed case management order.

Dated: September 4, 2008                    Respectfully submitted,

                                            GREGORY G. KATSAS
                                            Assistant Attorney General

                                            JOHN C. O'QUINN
                                            Deputy Assistant Attorney General

                                             */s/ August E. Flentje*

---

[8] Petitioners' reliance on *Parhat v. Gates*, 532 F.3d 834 (2008), is inapt. Whatever may be necessary to establish the reliability of evidence, *Parhat* had nothing to do with its admissibility, under the CSRT rules at issue there or (even more obviously) under the appropriate standards for wartime constitutional proceedings.

[9] Because these issues are before judges, and not juries, the concern over hearsay is clearly diminished regardless of these arguments. *See Cobell v. Norton*, 224 F.R.D. 1, 5 (D.D.C. 2004) ("[i]n civil bench trials, . . . many experienced judges admit hearsay they deem reasonably reliable and probative, either 'for what it is worth' or on some more explicit rejection of the hearsay rule and its some 30 exceptions.").

JOSEPH H. HUNT (D.C. Bar No. 431134)
VINCENT M. GARVEY (D.C. Bar No. 127191)
JUDRY L. SUBAR (D.C. Bar No. 347518)
TERRY M. HENRY
AUGUST E. FLENTJE
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20530
Tel:  (202) 514-1278
Fax:  (202) 514-7964
Attorneys for Respondents